UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| COURTNEY MCDERMOTT,<br><br>            Plaintiff,<br>   v.<br><br>SUN LIFE ASSURANCE COMPANY OF CANADA,<br><br>            Defendant. | CASE NO. C23-5676 BHS<br><br>ORDER |

THIS MATTER is before the Court on the parties' Federal Rule of Civil Procedure 52 cross-motions for judgment on the record[1] in this ERISA long term disability benefits case. Dkts. 11 and 13. Because plaintiff Courtney McDermott's disability is at least partly psychological—Functional Neurological Disorder (FND)—Sun Life's Long Term Benefits Group Policy requires her to be under the continuing care of a physician with the "most appropriate specialty" to evaluate, manage or treat her

---

[1] This Order incorporates the Court's findings of fact and conclusions of law on the administrative record and the briefs.

ORDER - 1

condition. And because she is not under the continuing care of such a physician, she is not entitled to benefits under the Sun Life long term disability policy.

## I.  BACKGROUND

The history of McDermott's disability and efforts to diagnose and treat it are lengthy and complicated, but the issue presented in her claim for long term disability benefits under her Sun Life Group Policy is relatively straightforward.

McDermott is a clinical pharmacist, formerly working in a MultiCare hospital Emergency Room. Through her employer, she was the beneficiary of a Sun Life Group Long Term Disability Policy. The policy includes an "elimination period," which is a continuous 90-day period of disability before the policy pays benefits. Dkt. 12-1 at 221. To obtain benefits for a "total disability" the insured must be "unable to perform one or more of the Material and Substantial Duties of her Regular Occupation" for the Elimination Period and for the next 24 months. Dkt. 11 at 9. The policy also requires as a condition of payment that the insured be under the "continuing care" of a physician whose medical specialty is the "most appropriate" to evaluate, manage or treat the disability:

> **Continuing Care** means you visit a Physician whose medical specialty is the most appropriate specialty to evaluate, manage or treat your Accident or Sickness and you receive care and Treatment as frequently as is Medically Necessary according to generally accepted medical standards.

Dkt. 12-1 at 223.

The policy also defines "mental illness" as a disease or disorder that is the "result in any way" of a psychological condition. *Id.* at 226. To obtain benefits for such a

ORDER - 2

disability, the insured must be in the care of a physician who specializes in psychiatric care. *Id*. at 242.

In 2018, McDermott began suffering fatigue and sleepiness issues. By early 2021 she had unpredictable seizures and other severe, escalating symptoms. On May 20, 2021, McDermott experienced new symptoms at work. She had facial spasms in the right side of her face, accompanied by sweating and feelings of euphoria, hallucinations and vocalized "yips." The next day she went to the ER and began a lengthy and multi-disciplinary effort to determine what was wrong.

The history of McDermott's numerous symptoms and the many specialists she has seen is thoroughly documented in the record. Dkt. 12. Her current treating physician, Dr. Alison Hearst, is a naturopath. Hearst prepared succinct narrative in February 2022. Dkt. 12-1 at 579–583. It includes a summary of McDermott's symptoms:

> Courtney's symptoms include the following non epileptic seizures (include involuntary movements involving face, head, neck, shoulder, dominant arm, rib cage and abdominal muscles), facial spasms, loss of fine motor control in dominant hand, pre-seizure auras with euphoria and or sensory disturbances, excessive sweating, post seizure fatigue and nausea, issues with word finding ability and memory loss, tics, repeated phrases, pseudobulbar affect, fatigue, excessive sleepiness, sleep paralysis, nausea, vomiting, nystagmus, dizziness/ balance issues, muscle weakness and pain, abdominal pain, urinary symptoms, taste and smell disturbances, vision loss, histamine reactions and skin rashes, general anxiety and social anxiety, distress and embarrassment of public seizures, depression, feelings of isolation, loss of independence.

*Id*. at 581.

McDermott stopped working for MultiCare on May 20, 2021. Over the summer, she saw a host of doctors and underwent various tests and scans, under the care of her neurologist, Dr. Abraham. Abraham could not find the cause, concluding that there was

"no well described neurologic condition that could explain all these symptoms and findings." Dkt. 12-2 at 180. Abraham recommended a second opinion and follow up with the Cleveland Clinic in Ohio. *Id*.

McDermott made a claim for benefits under the Sun Life policy on September 25, 2021, claiming a disability onset date of May 20. Dkt. 12-4 at 106. She claimed her disability was "exhaustion, hemifacial spasms, seizure activity, n/v, nystagmus, partial blindness and demyelination in spinal column." *Id*. Sun Life sent McDermott to Dr. Collins, a neurologist, who reviewed the prior evaluations and in October 2021 concluded that her medical records did not support that she had any work limitations or restrictions. *Id*.

During the fall of 2021, McDermott also saw a neurologist, Dr. Chun, who determined that "functional neurologic disorder (FND) was the most likely cause of her symptoms." In November, McDermott was admitted to the Cleveland Clinic for five days, for another battery of tests and examinations. An internist there, Dr. Ha, concluded that McDermott's records "only disclosed a possible diagnosis of functional movement disorder" and referred McDermott for further testing in neurology, hematology/oncology, ophthalmology, and sleep medicine. Dkt. 12-1 at 516–517. Doctors in these specialties ruled out a sleep disorder, a vision problem, and any malignancy. McDermott also saw a rheumatologist, Dr. Yaseen, who concluded that while McDermott might have another autoimmune process to be explored, that was not what was causing her seizures and spasms. Dkt. 12-1 at 463.

At the Cleveland Clinic McDermott was also evaluated by neurologists Drs. Merriman, Uysal, Siddiqui and Fesler. Uysal and Siddiqui concluded that McDermott's overall presentation was supportive of a "functional neurologic disorder." Dkt. 12-1 at 417 and 401. She was discharged from the Cleveland Clinic on November 5, with a recommendation for a "mental health follow up." Dkt. 12-2 at 380–81. McDermott saw Abraham upon her return, who confirmed that no neurologic condition could explain McDermott's symptoms, and agreed with the FND diagnosis. Dkt. 12-2 at 224 and 228. Abraham noted that the Cleveland Clinic recommended a naturopath for cognitive behavioral therapy (CBT). *Id*.

McDermott began seeing Dr. Hearst for that treatment on November 22. Heart also referred her to another naturopath, Dr. Dompe, for "evaluation and management of conversion disorder." Dkt. 12-1 at 599–600.

Based on these records and Collins's October 27 opinion, Sun Life denied McDermott's claim for long term disability benefits on December 1, 2021. Dkt. 12-1 at 212–216. It concluded that McDermott had not demonstrated that she had limitations or restrictions that would preclude her from performing her job during the policy's Elimination Period (May 20 to August 19, 2021). *Id*.

McDermott reported to Sun Life the same day that there was a "mental component" to her illness and that she had been to the Cleveland Clinic for further evaluation, and that she was going to begin CBT. *Id*. at 32.

McDermott continued to see Hearst and Dompe over the next year. Sun Life contends that the record demonstrates that she did not see any psychiatric specialists for FND after she was admitted to the Cleveland Clinic. Dkt. 11 at 21.

On December 12, 2021, McDermott appealed Sun Life's denial of benefits, updating her medical records. Sun Life sent the records to a neurologist, Dr. Selkirk, and asked for a "peer review" on whether McDermott had restrictions or limitations that precluded her from working. Dkt. 12-1 at 110. He concluded that because she had no significant abnormalities from a neurological perspective, she was not precluded from working. *Id*.

Sun Life sent Selkirk's report to McDermott January 16, 2022. She responded three days later, confirming that she had an FND diagnosis, and explaining that though its cause was unknown, the seizures she suffered were real, and debilitating:

> The cause of functional neurologic disorder is unknown. The condition may be triggered by a neurological disorder or by a reaction to stress or psychological or physical trauma, but that's not always the case. Functional neurologic disorder is related to how the brain functions, rather than damage to the brain's structure (such as from a stroke, multiple sclerosis, infection or injury)."
>
> So as he pointed out they cannot find a structural reason. Correct, that's why I was **not** given the diagnosis of epilepsy, because they are not epileptic seizures, but they are real seizures and they are debilitating and are clearly supported in my diagnosis of functional neurological disorder. They are referred to as (PNES) psychogenic nonepileptic seizures or (PNEE) psychogenic nonepileptic events. The Cleveland clinic witnessed and documented 5 of these in a 48 hour period.

Dkt. 12-3 at 123–124. McDermott apparently retained counsel in February 2022, and in May updated her medical records. Sun Life sent the new records to Selkirk, and on June 28, 2022, he reaffirmed his conclusion that McDermott did not have an underlying neurological condition. Dkt. 11 at 22.

ORDER - 6

Sun Life referred McDermott's claim to a forensic psychiatrist, Dr. Klegman, to determine whether the records supported a behavioral health diagnosis and if her condition impaired her ability to work as of May 21, 2021. Klegman reviewed her records and her claim on July 20, 2022. He concluded that the records supported the psychiatric diagnosis of FND and that her symptoms are not consistent with a neurological condition. Dkt. 12-2 at 651–657. He also noted that McDermott had selected naturopaths as her primary care provider and her behavioral health provider, and explained that these treaters are not medical doctors or psychiatric specialists. They cannot diagnose or prescribe psychotropic drugs to treat. For these reasons, naturopathic intervention is usually complimentary to more traditional approaches. *Id*. at 656.

The back and forth between McDermott, Hearst and Dompe on one side, and Sun Life, Selkirk, and Klegman on the other, continued through the rest of year. McDermott responded to Klegman's report on September 16, providing additional records from Hearst and Dompe, and letters from each.

McDermott's letter asserted that FND was not *per se* a mental disorder: the "older idea" that FND is "all psychological" has changed since the mid 2000s; FND is not a diagnosis of exclusion and that in some people psychological factors are important, in others they are not. Dkt. 12-2 at 674. Relying primarily on Hearst and Dompe's letters and records, McDermott argued that her symptoms could easily be explained by neurological and other physical or medical conditions,[2] and that her FND was therefore

---

[2] McDermott asserts that Yaseen "noted that her symptoms could be caused by another 'auto immune process.'" Dkt. 13 at 21 (citing Dkt. 12-1 at 463). But Yaseen did not so opine:

excluded from coverage by the Sun Life policy's "mental illness" provision. *Id*. at 678–679.

Hearst's attached letter asserted that FND is a disorder of the functioning of the nervous system and likely has many causes, as does, by analogy, heart disease. Dkt. 12-2 at 680. Dompe's letter asserted that FND is a disorder of the nervous system and McDermott had measurable physiological changes that caused her symptoms; he had witnessed one of her seizure-like episodes. *Id*. at 682.

On September 29, Selkirk amended his report in response to McDermott's submittal. He disagreed that FND can be a neurological disorder:

> Functional neurological deficits represent either feigned symptoms or a manifestation of psychopathology. This is the definition of the diagnostic category and that is why these conditions are categorized separately from neurological conditions. Although some persons with functional disorder have co-morbid neurological disorders, there is no convincing evidence for a neurological basis of functional disorder.

Dkt. 12-3 at 14. He reiterated his conclusion that McDermott's "nonspecific" abnormalities on imaging and lab studies "do not support that she is impaired or has any underlying neurological condition." *Id*.

On September 30, Klegman also amended his opinion, stating:

> The clinical documentation supports impairment based on the diagnosis of Functional Neurologic Symptom Disorder, which is a mental disorder per the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5-TR, 2022).

---

Yaseen concluded that such an issue was not causing McDermott's seizures, spasms, or symptoms. *Id*.

Dkt. 12-3 at 15. After another similar exchange, McDermott acknowledged on December 16 that the DSM-5-TR includes FND as a mental health disorder, but asserted that she did not meet the DSM's diagnostic criteria for FND, because she did not have "symptoms that cannot be explained by a neurological or other medical condition[.]" Dkt. 12-3 at 44.

Sun Life upheld the denial of McDermott's claim on December 29, 2022. Dkt. 12-3 at 51–58. It recognized that McDermott was unable to work due to her FND, but asserted that FND was a mental illness, and that its long term benefits policy conditioned benefits on her being under the "continuing care" of a "psychiatric specialist," not a naturopath. Dkt. 12-3 at 51–58.

McDermott sued in July 2023, seeking long term total disability benefits under Sun Life's policy. Dkt. 1. The parties' cross motions for judgment on the record revive the debate described above, and ask the Court to resolve it.

Sun Life's motion, like its final denial of benefits, argues that McDermott cannot work because of her FND, that FND is a mental illness under the DSM, and that its policy requires one unable to work due in any part to a mental illness to be under the continuing care of a psychologist to obtain benefits. McDermott has not been under a psychologist's care, and she is therefore not entitled to benefits. Dkts. 11 and 14.

McDermott argues that FND is not necessarily a mental illness, that she is not diagnosable with FND under the DSM criteria, that Hearst and Dompe believe her symptoms are or at least could be caused by a physical or neurological disorder, and that even if she does have a psychiatric disorder, Dompe is an appropriate physician to treat her. Dkts. 13 and 15.

Th issues are addressed in turn.

## II. DISCUSSION

**A.     Standard of review**

The parties agree that the Court reviews the underlying record and the denial of benefits de novo. Dkt. 11 at 7–8 (citing Wash. Admin. Code § 284-96-012). Sun Life accurately describes the Court's role in reviewing the facts and the policy:

> When *de novo* review applies, the court applies federal common law and renders its own decision on the appropriate interpretation and application of terms to the facts presented. *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002); *Walker v. American Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999). In other words, the court performs an "independent and thorough inspection of an administrator's decision" in light of the administrative record, to determine whether the administrator made the correct decision on that record. *Silver v. Executive Car Leasing LTD Plan*, 466 F.3d 727, 733 (9th Cir. 2006). However, a court conducting a *de novo* review of the administrative record must interpret policy terms so as to give them their full meaning and effect. *Feibusch v. Integrated Device Tech., Inc. Employee Benefit Plan*, 463 F.3d 880, 886 (9th Cir. 2006).

Dkt. 11 at 8. McDermott carries the burden of proving by a preponderance of the record evidence that she is entitled to benefits under Sun Life's long-term benefits policy. *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294, 1296 (9th Cir. 2010).

The Court's task, then, is to evaluate the record evidence and determine whether Sun Life's determination was correct. It is an unusual one; there is no live testimony or cross examination, and the Court is not a medical professional. The Court nevertheless finds and concludes that McDermott's disability is caused in substantial part by a psychological disorder and that she is not under the continuing care of the most

appropriate specialist for that illness. As a result, she is not entitled to benefits under the Sun Life policy.

**B.      McDermott's condition is at least partly psychological.**

McDermott argues that her symptoms are not a mental illness as defined under the policy. Specifically, she reiterates that the DSM's criteria that she suffer "symptoms that cannot be explained by a neurological or other medical condition" is not met, because her records demonstrate various other physiological abnormalities, including her copper levels and markers for autoimmune and other diseases and conditions, which could explain her symptoms. She asserts that Hearst and Dompe believe there is a physical cause for her symptoms, that doctors at the Cleveland Clinic felt she had an auto immune disorder, and that Abraham did not rule out a neurological cause of her seizures. Dkt. 13 at 19–22.

The gist of McDermott's claim is that FND is not a mental illness because her symptoms can be explained by a general health condition, emphasizing that Hearst and Dompe are "adamant" that the causes are likely physical. Dkt. 15 at 1–2. She also asserts that Sun Life has yet to complete an appropriate investigation into these potential physical causes, and that her condition cannot be considered "psychiatric FND" until these other causes have been eliminated. *Id*; see also Dkt. 13 at 5–7.

This latter claim is not persuasive. The record reflects that, like McDermott, Sun Life diligently sought to identify her problem and its cause, and it responded promptly to each of her new submittals. Indeed, based on those submittals, it abandoned its initial position that she was not entitled to benefits because she was able to perform her job.

1 | McDermott has been thoroughly examined for almost two years. Her claim that the
2 | investigation is not complete, or that Sun Life failed to conduct a full and fair review of
3 | her claim is not supported by the record and is rejected.

4 |      Sun Life argues McDermott's FND is a mental illness under the policy because (1)
5 | it is medically classified or considered to be psychological under DSM-5-TR (the most
6 | recent version); (2) it is manifested by psychological distress or impaired social
7 | functioning, or both, and is (3) treated by psychotherapeutic or sociotherapeutic methods
8 | or by medication intended to alter or affect emotions, behavior or thought content. Dkt.
9 | 11 at 32 (citing policy, Dkt. 12-1 at 226). Sun Life emphasizes that under its policy, a
10 | condition is a mental illness if it is medically classified or considered whether in whole or
11 | in part to be psychological under the DSM. Dkt. 11 at 32. Because the DSM classifies
12 | FND as a mental illness, it argues, it is a mental illness under the policy.

13 |      It argues that the other "abnormalities" upon which McDermott and her current
14 | treaters rely were considered *non*diagnostic by her own treating physicians over time,
15 | including at the Cleveland Clinic: Drs. Tivova, Abraham, Ha, Merriman, Yaseen,
16 | Aboseif, Uysal, Siddiqui, Fesler, Nair, and Chun. Drs. Selkirk and Klegman, admittedly
17 | working for Sun Life, also found that these other "nonspecific" findings could not explain
18 | her symptoms. Dkt. 11 at 27–31.

19 |      The Court agrees with Sun Life, and with the substantial weight of the medical
20 | opinion evidence. McDermott correctly contends that any ambiguities in the policy must
21 | be construed in favor of coverage, but the policy is not ambiguous: if the condition is
22 | even partly psychological, it is a mental illness. And, importantly, McDermott carries the

burden of proof on her claim. Sun Life persuasively argues that in this context, she carries the burden of proving that her condition does not fall under the mental illness provision. Dkt. 11 at 36 (citing *Feldsher v. Liberty Life Assurance Co. of Bos.*, No. 2:13-cv-00533- LDG-GWF, 2014 U.S. Dist. LEXIS 97920, at *26 (D. Nev. July 18, 2014) (in a LTD case involving nonepileptic psychogenic seizures, holding that plaintiff "bears the burden of demonstrating that her impairments are not due to mental illness"); and *Gill v. Unum Life Ins. Co. of Am.*, No. 19-CV-04066- EMC, 2020 WL 6868832, at *8 (N.D. Cal. Nov. 23, 2020) (finding that "inconclusive and poorly supported opinions are insufficient to carry [plaintiff's] burden of establishing by a preponderance of the evidence that his cognitive impairments were not caused by his bipolar depressive disorder.").

McDermott's assertion (and that of Hearst and Dompe) that one or more of the many other unusual findings in the numerous tests and scans she has undergone is the true cause of her symptoms, not the FND, requires some persuasive description of which one, and how it explains her symptoms. She has not met her burden.

The Court concludes that McDermott's symptoms are caused by FND, and that FND is a mental illness under the DSM and the policy.

**C.     Sun Life's Group Policy conditions benefits on continuing care from the most appropriate specialist.**

McDermott argues that even if her FND is partly psychological under the DSM and Sun Life's policy, Dr. Dompe is an appropriate treating provider, and that she is entitled to benefits under the policy.

ORDER - 13

1    Sun Life contends that its policy requires as a condition of benefits that an insured
2    be under the "continuing care" of a physician with "the most appropriate specialty" for
3    treating her illness. Dkt. 11 at 36 (citing Dkt. 12-1 at 223). It defines a physician as an
4    M.D. or a medical practitioner deemed by the state to have the same authority as a
5    qualified medical doctor. *Id*. (citing Dkt. 12-1 at 228). And it correctly contends neither
6    Dompe or Hearst are authorized under state law to prescribe medications for treating
7    mental illness; they cannot prescribe controlled substances other than codeine and
8    testosterone, and cannot prescribe psychotropic drugs. Dkt. 11 at 26 and 36.

9    McDermott argues that her primary care provider, Hearst, specifically referred her
10   to Dompe to treat her mental health and administer cognitive behavioral therapy (CBT).
11   Dkt. 13 at 25. She relies on her own physician's endorsement of Dompe, and reiterates
12   that he "specializes in the treatment of stress-related conditions." Dkt. 15 at 25–26. She
13   asserts that naturopaths are "one of the specialties perfectly suited to treat mental health
14   conditions," and that "CBT is one of the treatment methods recommended for" FND. *Id*.
15   (citing https://www.webmd.com/mental-health/doctors-treat-illness, and
16   https://advances.massgeneral.org/neuro/article.aspx?id=1141).

17   It is true that CBT was a *part* of the Cleveland Clinic's recommended treatment
18   for McDermott's FND, but McDermott does not rebut Sun Life's plainly correct assertion
19   that Dompe cannot prescribe psychotropic medications. McDermott's claim that Dompe
20   "clearly satisfies" the policy's definition of a medical doctor or a medical practitioner
21   with the *same authority* as a legally qualified medical doctor is not correct. Dkt. 13 at 7.
22   This definition does not turn on whether the subject medical provider would need to

ORDER - 14

prescribe psychotropic drugs; it provides that the insured must be under the continuing care of a medical doctor authorized to do so. *See* Dkt. 11 at 36 (citing 12-1 at 223). Dompe is not such a physician, whether or not the CBT is effectively treating McDermott's condition. Hearst's belief that Dompe's specialty was the "most appropriate" for McDermott does not make him so under the policy.

McDermott has not met her burden of proving that she is under the continuing care of a medical doctor or a medical practitioner with the same authority as a medical doctor, in the most appropriate specialty for her condition. The Court concludes and finds that she has not met the Sun Life policy's condition for the payment of benefits.

\*\*\*

McDermott is not entitled to benefits under Sun Life's long term disability policy. Sun Life's motion for judgment on the record, Dkt. 11, is **GRANTED**, and McDermott's reciprocal motion, Dkt. 13, is **DENIED**.

The Clerk shall enter a **JUDGMENT** and close the case.

**IT IS SO ORDERED**.

Dated this 9th day of May, 2025.

BENJAMIN H. SETTLE
United States District Judge